**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HOSH MOHAMED HOSH,

   *Petitioner-Appellee,*

   v.

ENRIQUE LUCERO, Field Office
Director, Office of Enforcement
and Removal, U.S. Immigration
and Customs Enforcement; JOHN
MORTON, Director, U.S.
Immigration and Customs
Enforcement; JAMES CHAPPARO,
Executive Associate Director, U.S.
Immigration and Customs
Enforcement; JANET NAPOLITANO,
Secretary, Department of
Homeland Security; ERIC H.
HOLDER, JR., Attorney General,

   *Respondents-Appellants,*

   and

DAVID L. SIMONS, Superintendent,
Hampton Roads Regional Jail,

   *Respondent.*

No. 11-1763

ASSOCIATION OF MEXICANS IN NORTH
CAROLINA; DETENTION WATCH
NETWORK; FAMILIES FOR FREEDOM;
IMMIGRANT DEFENSE PROJECT;
IMMIGRANT RIGHTS CLINIC;
IMMIGRATION EQUALITY; LEGAL AID
JUSTICE CENTER'S IMMIGRANT
ADVOCACY PROGRAM; NATIONAL
IMMIGRANT JUSTICE CENTER;
NATIONAL IMMIGRATION PROJECT;
KATHRYN O. GREENBERG
IMMIGRATION JUSTICE CLINIC;
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION,

*Amici Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:11-cv-00464-AJT-TRJ)

Argued: March 20, 2012

Decided: May 25, 2012

Before KEENAN and FLOYD, Circuit Judges, and
Norman K. MOON, Senior United States District Judge for
the Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Senior Judge
Moon wrote the opinion, in which Judge Keenan and Judge
Floyd concurred.

## COUNSEL

**ARGUED:** Gisela Ann Westwater, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Ofelia Lee Calderon, CALDERON, RACINE & DERWIN, PLC, Arlington, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Julie Edelstein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Tony West, Assistant Attorney General, Civil Division, Elizabeth J. Stevens, Assistant Director, District Court Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Alina Das, WASHINGTON SQUARE LEGAL SERVICES, New York, New York, for Association of Mexicans in North Carolina, Detention Watch Network, Families for Freedom, Immigrant Defense Project, Immigrant Rights Clinic, Immigration Equality, Legal Aid Justice Center's Immigrant Advocacy Program, National Immigrant Justice Center, National Immigration Project, and Kathryn O. Greenberg Immigration Justice Clinic, Amici Supporting Appellee. Andres C. Benach, DUANE MORRIS LLP, Washington, D.C.; Russell R. Abrutyn, MARSHAL E. HYMAN & ASSOCIATES, Troy, Michigan; Stephen W. Manning, IMMIGRATION LAW GROUP, PC, Portland, Oregon, for American Immigration Lawyers Association, Amicus Supporting Appellee.

---

## OPINION

MOON, Senior District Judge:

Title 8, United States Code, Section 1226(c) requires the mandatory federal detention, without the possibility of bond, of certain deportable criminal aliens "when" those aliens are released from other custody. The issue in this case is whether, as the district court held, Appellee, a deportable criminal alien

who was not *immediately* taken into federal custody upon his release from other custody, is exempt from § 1226(c)'s mandatory detention provision and therefore is entitled to a bond hearing.

Immigration law is at once highly technical and deeply controversial; in this case, however, settled law provides the answer. Deferring to the Board of Immigration Appeals ("BIA")'s decision on this question, we hold that Appellee is not exempt from mandatory detention, and we therefore reverse the district court's decision to grant a bond hearing.

I.

Appellee Hosh Mohamed Hosh is a citizen of Somalia. He entered the United States on or about January 19, 1999, as a derivative asylee, and he has been a lawful permanent resident of the United States since June 5, 2007. On March 4, 2008, in the Circuit Court of Fairfax County, Virginia, Hosh was convicted of unlawful wounding in violation of Virginia Code § 18.2–51 and grand larceny in violation of Virginia Code § 18.2–95. Hosh received a concurrent two-year sentence for each offense, but the circuit court suspended both sentences in their entirety, and placed Hosh on supervised probation for a period of two years.

United States Immigration and Customs Enforcement ("ICE") arrested Hosh at his home on March 21, 2011, and detained him at the Hampton Roads Regional Jail in Portsmouth, Virginia. ICE issued a Notice to Appear and charged Hosh with removability under the Immigration and Nationality Act ("INA") for having committed an aggravated felony after entry into this country. *See* 8 U.S.C. § 1227(a)(2)(A)(iii) (providing that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable"); 8 U.S.C. § 1101(a)(43)(F) and (G) (defining "crime[s] of violence" and "theft offense[s]" for which the possible terms of imprisonment are at least one year as "aggravated felon[ies]").

After his arrest, Hosh requested a bond hearing. The immigration judge, however, found that Hosh was subject to mandatory detention under 8 U.S.C. § 1226(c), and denied the hearing. Hosh filed a petition for a writ of habeas corpus in the Eastern District of Virginia. Hosh did not dispute the fact that he was an alien, or that he had been convicted of two aggravated felonies, or that such convictions rendered him deportable; rather, he argued that he was not subject to mandatory detention under § 1226(c) because ICE had not taken him into custody immediately upon his release from state custody.

The district court granted Hosh's petition, in part, and remanded the matter to the immigration court with instructions to hold a bond hearing within ten days. Relying on three prior Eastern District of Virginia cases,[1] the district court found that "the release provisions of Section 1226(c)(2) apply only in those instances where the Attorney General has acted in compliance with Section 1226(c)(1)," *i.e.*, when the Attorney General has taken the criminal alien into federal custody at the time the alien is released from any custody pertaining to a designated offense. *Hosh v. Lucero*, Civil Action No. 1:11–cv–464, 2011 WL 1871222, at *3 (E.D. Va. May 16, 2011).

## II.

Matters of statutory construction present questions of law,

---

[1]The district court cited *Cummings v. Holder*, Case No. 1:10–cv–1114, 2011 U.S. Dist. LEXIS 53626, at *4–5 (E.D. Va. Jan. 14, 2011) (alien detained nine years after release from state custody), *Bracamontes v. Desanti*, Case No. 2:09cv480, 2010 WL 2942757, at *1 (E.D. Va. July 26, 2010) (alien detained eight years after release from state custody), and *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (alien detained over a month after release from state custody). As indicated in note 3, *infra*, in the time since the district court granted Hosh's petition, other Eastern District of Virginia cases implicating § 1226(c) have also held in favor of petitioning aliens.

which we generally review de novo. *Midi v. Holder*, 566 F.3d 132, 136 (4th Cir. 2009) (citation omitted). However, when a statutory provision of the INA is ambiguous, "the BIA's interpretations . . . must be given controlling weight unless those interpretations are 'arbitrary, capricious, or manifestly contrary to the statute.'" *Fernandez v. Keisler*, 502 F.3d 337, 344 (4th Cir. 2007) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, at 844 (1984)).

In our view, although § 1226(c) may arguably be susceptible to more than one interpretation, the BIA's interpretation of the statute in *In re Rojas*, 23 I. & N. Dec. 117 (BIA 2001), is a permissible, and more plausible, construction. We therefore give deference to the BIA's interpretation, and we must reverse the holding below.

## III.

### A.

*Chevron* sets forth a two-step analysis. First, the reviewing court considers "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If the court answers this threshold question in the affirmative, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43. However, if

> the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843 (footnote omitted). Notably, "[t]he court need not conclude that the agency construction was the only one it per-

missibly could have adopted to uphold the construction, or even the reading the court would have reached . . . ." *Id.* at 843 n.11 (citations omitted).

No circuit court has yet considered the meaning and applicability of § 1226(c) under these precise circumstances, and the numerous district courts previously considering § 1226(c) have reached different conclusions. Some district courts have agreed with the holding we reach herein, finding ambiguity in the statute and giving deference to the BIA's prior interpretation of § 1226(c) in *Rojas*.[2] Other district courts, however, including several courts within the Fourth Circuit, have held that the plain meaning of § 1226(c) requires a decision in the detainee's favor.[3]

---

[2]*See, e.g.*, *Guillaume v. Muller*, No. 11 Civ. 8819(TPG), 2012 WL 383939, at *4–6 (S.D.N.Y. Feb. 7, 2012); *Hernandez v. Sabol*, ___ F. Supp. 2d ___, 2011 WL 4949003, at *3 (M.D. Pa. Oct. 18, 2011); *Garcia Valles v. Rawson*, No. 11–C–0811, 2011 WL 4729833, at *3 (E.D. Wis. Oct. 7, 2011); *Diaz v. Muller*, No. 11–4029 (SRC), 2011 WL 3422856, at *2–3 (D.N.J. Aug. 4, 2011); *Gomez v. Napolitano*, No. 11–cv–1350(JSR), 2011 WL 2224768, at *4 (S.D.N.Y. May 31, 2011); *Sulayao v. Shanahan*, No. 09–cv–7347(PKC), 2009 WL 3003188, at *3–7 (S.D.N.Y. Sept. 15, 2009); *Serrano v. Estrada*, No. 3–01–CV–1916–M, 2002 WL 485699, at *3 (N.D. Tex. Mar. 6, 2002); *Saucedo-Tellez v. Perryman*, 55 F. Supp. 2d 882, 884–85 (N.D. Ill. 1999).

[3]*See, e.g.*, *Ortiz v. Holder*, No. 2:11CV1146 DAK, 2012 WL893154, at *3–4 (D. Utah Mar. 14, 2012); *Harris v. Lucero*, Civil Action No. 1:11–cv–692, 2012 WL 603949, at *3 (E.D. Va. Feb. 23, 2012); *Jaghoori v. Lucero*, No. 1:11–cv–1076, 2012 WL 604019, at *3 (E.D. Va. Feb. 22, 2012); *Parfait v. Holder*, Civil No. 11–4877 (DMC), 2011 WL 4829391, at *4–9 (D.N.J. Oct. 11, 2011); *Beckford v. Aviles*, No. 10–235 (JLL), 2011 WL 3515933, at *7 (D.N.J. Aug. 9, 2011); *Rianto v. Holder*, No. CV–11–0137–PHX–FJM, 2011 WL 3489613, at *3 (D. Ariz. Aug. 9, 2011); *Keo v. Lucero*, No. 1:11cv614, 2011 WL 2746182, at *3–5 (E.D. Va. July 13, 2011); *Sylvain v. Holder*, Civil No. 11–3006 (JAP), 2011 WL 2580506, at *4–6 (D.N.J. June 28, 2011); *Cummings*, 2011 U.S. Dist. LEXIS 53626, at *4–5; *Louisaire v. Muller*, 758 F. Supp. 2d 229, 235–36 (S.D.N.Y. 2010); *Gonzalez v. DHS*, No. 1:CV–10–0901, 2010 WL 2991396, at *1 (M.D. Pa. July 27, 2010); *Bracamontes*, 2010 WL 2942757, at *1; *Dang v. Lowe*, Civil No. 1:CV–10–0446, 2010 WL

The meaning of § 1226(c) is not plain to us. To be sure, "when" in § 1226(c) can be read, on one hand, to refer to "action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun." *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (citing 20 *The Oxford English Dictionary* 209 (2d ed. 1989); *The American Heritage Dictionary of the English Language* (4th ed. 2000)). On the other hand, "when" can also be read to mean the temporally broader "at or during the time that," "while," or "at any or every time that . . . ." *Free Merriam-Webster Dictionary*, *available at* http://www.merriam-webster.com/dictionary/when (last visited April 30, 2012). We must therefore consider the BIA's interpretation.

In *Rojas*, the BIA considered the natural and ordinary reading of the statute, the overall statutory context, certain predecessor provisions, and practical considerations that the BIA had previously addressed in *In re Noble*, 21 I. & N. Dec. 672, 681–82 (BIA 1997).[4] In parts most relevant to the instant appeal, the BIA determined that "the respondent is subject to mandatory detention pursuant to [§ 1226(c)], despite the fact

---

2044634, at *1–2 (M.D. Pa. May 20, 2010); *Mongestime v. Reilly*, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010); *Khodr v. Adduci*, 697 F. Supp. 2d 774, 778–80 (E.D. Mich. 2010); *Scarlett v. DHS*, 632 F. Supp. 2d 214, 219–20 (W.D.N.Y. 2009); *Waffi*, 527 F. Supp. 2d at 486–88; *Bromfield v. Clark*, No. C06–757RSM, 2007 WL 527511, at *3–4 (W.D. Wash. Feb. 14, 2007); *Roque v. Chertoff*, No. C06 0156 TSZ, 2006 WL 1663620, at *4–5 (W.D. Wash June 12, 2006); *Zabadi v. Chertoff*, No. C 05–03335 WHA, 2005 WL 3157377, at *3–5 (N.D. Cal. Nov. 22, 2005); *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1227–31 (W.D. Wash. 2004); *Alikhani v. Fasano*, 70 F. Supp. 2d 1124, 1130 (S.D. Cal. 1999).

[4]The practical considerations entertained by the BIA in *Noble*, a case in which the BIA evaluated the applicability of certain Transition Period Custody Rules not at issue in the instant appeal, included congressional unease about the growing criminal alien population in this country and "the failure to effectuate the removal of many of these aliens." *In re Noble*, 21 I. & N. Dec. 672, 681 (BIA 1997) (citing H.R. Rep. No. 104-469(I) (1996)).

that he was not taken into [federal] custody immediately upon his release from state custody." *Rojas*, 23 I. & N. Dec. at 127. While disagreeing with the majority's interpretive approach, two BIA Board Members concurred in the result, explaining that "[i]t is difficult to conclude that Congress meant to premise the success of its mandatory detention scheme on the capacity of the [Immigration and Naturalization] Service[5] to appear at the jailhouse door to take custody of an alien at the precise moment of release." *Id.* at 128.

Applying *Chevron*, we conclude that the BIA's determination that criminal aliens like Hosh are subject to mandatory detention, despite not having been detained immediately upon release from state custody, is based on a permissible construction of § 1226(c).

Context assures us that the BIA permissibly construed 8 U.S.C. § 1226(c). In enacting § 1226(c), Congress had a range of options available to it with respect to how aggressively it sought to detain criminal aliens. If we accept that "when . . . released" means "at the moment of release," then we must conclude that Congress intended to take an aggressive stance against criminal aliens, *i.e.*, Congress wanted federal authorities to detain criminal aliens *immediately* upon their release from other custody. We cannot, however, take another step and find that, if the criminal alien was not immediately detained after release due to an administrative oversight or any other reason, then Congress's clear intent was to have that criminal alien no longer be subject to the mandatory detention provision of § 1226(c). With this in mind, we conclude that it is far from plain, and indeed unlikely, that "when . . . released" means "at the moment of release, *and not later*." While that conclusion is possible, we think that it is strained.[6]

---

[5]The Immigration and Naturalization Service, or INS, is now known as ICE.

[6]At oral argument, counsel for Appellee invited the Court to conclude that Congress, by using the phrase "when . . . released," intended to

Supporting our opinion that the BIA reasonably construed § 1226(c) is the description of the statutory scheme provided by the Supreme Court of the United States in *Demore v. Kim*, 538 U.S. 510, 518 (2003). In *Demore*, the Court considered the constitutionality of § 1226(c) and, in upholding the statute, observed that "Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Id.* (citations omitted). That backdrop included the fact that federal authorities suffered from a "near-total inability to remove deportable criminal aliens," due in large part to the INS's "failure to detain those aliens during their deportation proceedings" under the statutes previously in force, which gave the Attorney General broad discretion to release criminal aliens pending their removal proceedings. *Id.* at 519 (citations omitted). Because "deportable criminal aliens who remained in the United States often committed more crimes before being removed," *id.* at 518, and because "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings," *id.* at 519 (citing S. Rep. No. 104-48, at 1 (1995)), Congress endeavored to amend the immigration scheme that was in place before the passage of § 1226(c).

Thus, while we agree that Congress's command to the Attorney General to detain criminal aliens "when . . . released" from other custody connotes some degree of immediacy, we cannot conclude that Congress clearly intended to exempt a criminal alien from mandatory detention and make

---

exempt a criminal alien from mandatory custody if the alien was released from state custody and then got as far as the adjacent parking lot before being detained by federal authorities. We cannot deem it clear that Congress would, on one hand, be so concerned with criminal aliens committing further crimes, or failing to appear for their removal proceedings, or both, that Congress would draft and pass the mandatory detention provision, but on the other hand, decide that if, for whatever reason, federal authorities did not detain the alien immediately upon release, then mandatory detention no longer applies.

him eligible for release on bond if the alien is not *immediately* taken into federal custody.[7]

B.

Because numerous district courts have found that § 1226(c) requires a result contrary to our ruling today, we explain that, even if we assume that the statute commands federal authorities to detain criminal aliens at their exact moment of release from other custody, we still conclude that a criminal alien who is detained *after* that exact moment is not exempt from mandatory detention.

As the Supreme Court of the United States explained in *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 161 (2003), "a statute directing official action needs more than a mandatory 'shall' before the grant of power can sensibly be read to expire when the job is supposed to be done." In other words, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993) (citations omitted).

In *United States v. Montalvo-Murillo*, 495 U.S. 711, 713-14 (1990), the Court considered whether the Government was required to release a suspect when it had failed to provide a detention hearing "immediately upon the [suspect's] first

---

[7]Both parties look beyond the text to argue that the grammatical structure of the statute supports their respective positions on the interpretation of "when." Additionally, in accordance with the canon of statutory interpretation that courts should "give effect, if possible, to every clause and word of a statute," *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883), the parties each claim that the other's reading renders certain parts of the statute superfluous, and is therefore impermissible. We do not expressly take up these matters, however, because they are, in large part, bound up in the parties' arguments about the plain meaning of "when," and they do not resolve the ambiguity.

appearance before the judicial officer" pursuant to 18 U.S.C. § 3142(f). Due to a magistrate judge's *sua sponte* continuance that did not comply with § 3142(f), the district court and the court of appeals held that pretrial release of the defendant (on conditions) was required. 495 U.S. at 716.

The Supreme Court, however, found that "[n]othing in § 3142(f) indicates that compliance with the first appearance requirement is a precondition to holding the hearing or that failure to comply with the requirement renders such a hearing a nullity," and that "a failure to comply with the first appearance requirement does not defeat the Government's authority to seek detention of the person charged." *Id.* at 717. The Court observed that "construction of the Act must conform to the 'great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.'" *Id.* at 718 (quoting *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 (1986)). In situations like these,

> in realistic and practical terms, it is inevitable that, despite the most diligent efforts of the Government . . . , some errors in the application of the time requirements of § 3142(f) will occur. . . . In these situations, there is no reason to bestow upon the defendant a windfall and to visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the strictures of § 3142(f) occurs.

*Id.* at 720.

Like the statute at issue in *Montalvo-Murillo*, § 1226(c) does not specify any consequence for the Government's failure to detain a criminal alien immediately upon release, and therefore even if "the duty is mandatory, the sanction for

breach is not loss of all later powers to act." *Id.* at 718.[8] Thus, although the Government would retain the ability to detain criminal aliens after a bond hearing under the district court's reading of § 1226(c), Congress intended those aliens to be mandatorily detained *without* a bond hearing. The negligence of officers, agents, or other administrators, or any other natural circumstance or human error that would prevent federal authorities from complying with § 1226(c), cannot be allowed to thwart congressional intent and prejudice the very interests that Congress sought to vindicate.

We emphasize that § 3142(f), at issue in *Montalvo-Murillo*, was unquestionably written for the benefit of defendant-arrestees. Part of the Bail Reform Act, § 3142(f) required the Government to meet a statutory burden before pretrial detention would be allowed. Here, § 1226(c) was undeniably *not* written for the benefit of criminal aliens facing deportation like Hosh. The *Montalvo-Murillo* holding that the Government does not forfeit its ability to detain a defendant after a failure to comply with a statutory immediacy requirement written for the defendant's benefit is therefore doubly persuasive in the instant setting.

## C.

Finally, we take a moment to explain why we have declined to apply the rule of lenity to this case. In immigration cases, the rule of lenity stands for the proposition that ambiguities in deportation statutes should be construed in favor of the noncitizen. *See Fong Haw Tan v. Phelan*, 333

---

[8]Because the Government would retain discretionary authority to hold a criminal alien under § 1226(a), Hosh argues that his reading of § 1226(c) "would not render a person immune from detention because of a timing violation," while a ruling against the Government in *Montalvo-Murillo* would have resulted in a total defeat of the Government's ability to detain a defendant. Although this distinction is valid, we cannot say that it makes the *Montalvo-Murillo* decision any less applicable to this appeal.

U.S. 6, 9-10 (1948).**⁹** The rule exists "because deportation is a drastic measure and at times the equivalent of banishment or exile," *id.* at 10, and courts are reluctant to construe such statutes against individuals whose rights would be affected without an affirmative indication from Congress that courts should do so.

In some instances, as here, the rule of lenity and *Chevron* point in opposite directions. Deciding whether to apply the rule of lenity or whether to instead give deference to an agency interpretation is no small task. *See generally* Elliot Greenfield, *A Lenity Exception to Chevron Deference*, 58 Baylor L. Rev. 1, 41 (2006) ("Court of appeals decisions indicate a split of opinion on the issue of how *Chevron* interacts with the rule of lenity."); Brian G. Slocum, *The Immigration Rule of Lenity and Chevron Deference*, 17 Geo. Immigr. L.J. 515, 517 (2003) ("[T]he role of the immigration rule of lenity in deportation proceedings is not clear due to the competing [*Chevron*] deference doctrine . . . .").

In this particular instance, we defer to the BIA without invoking the rule of lenity. We do so because "[t]he rule of lenity is a last resort, not a primary tool of construction," *United States v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998), and "[t]o invoke the rule, we must conclude that there is a *grievous* ambiguity or uncertainty in the statute," *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) (emphasis added) (citations and internal quotation marks omitted). *See also Barber v. Thomas*, 130 S. Ct. 2499, 2509 (2010) (declining to invoke the rule of lenity because the Court did "not believe that there remain[ed] a 'grievous ambiguity or uncertainty' in the statutory provision before [it]."); *United States v. Hayes*, 555 U.S. 415, 429 (2009) (acknowledging that the

---

**⁹**While the rule of lenity applies in the immigration setting, its earliest applications can be traced to strictly criminal statutes. *See Liparota v. United States*, 471 U.S. 419, 424 (1985) (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812)). We cite the rule in both forms herein.

statute at issue was "not a model of the careful drafter's art," but rejecting the applicability of the rule of lenity because the statute was not grievously ambiguous).

Although we have acknowledged that some ambiguity exists in § 1226(c), we find that such ambiguity does not rise to a level of grievousness that would require us to call upon the rule of lenity. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) (A provision is not "ambiguous for purposes of lenity merely because it [is] *possible* to articulate a construction more narrow that that urged by the Government.") (citation and internal quotation marks omitted). Thus, the conditional requirement needed to invoke the rule of lenity—that the statutory ambiguity be "grievous"—does not exist in this case. In the *Chevron* analysis, however, deference should be afforded to an agency interpretation when Congress has not directly addressed the precise question at issue, provided that the agency's interpretation is based on a permissible construction of the statute. 467 U.S. at 843. As we have already explained, the conditional requirements needed to invoke *Chevron* do exist, and we therefore rely on *Chevron* instead of the rule of lenity.

Moreover, we doubt that § 1226(c) is the type of provision to which the rule of lenity should rightly apply, given the rule's express rationale. In immigration cases, courts apply the rule of lenity because deportation is such a drastic measure. Although the rule of lenity has not been expressly confined to cases strictly involving deportation, *cf. Lok v. INS*, 548 F.2d 37, 39 (2d Cir. 1977) (stating that the immigration rule of lenity was "*especially* pertinent" in a deportation case) (emphasis added), we have found no judicial opinions applying the rule of lenity to the interpretation of § 1226(c)'s mandatory detention provision. After all, a criminal alien in Hosh's position would be subject to deportation proceedings whether or not § 1226(c) existed; the provision merely with-

draws the Attorney General's discretion to release such an alien on bond pending those proceedings.[10]

## IV.

We hold that the BIA's interpretation of § 1226(c) in *Rojas* was reasonable, and must be afforded deference. Moreover, the Government's supposed failure to comply with a statutory immediacy requirement—when the statute does not specify a consequence for such noncompliance—does not bestow a windfall upon criminal aliens. Hosh, therefore, remains subject to mandatory detention.

*REVERSED AND REMANDED*

---

[10]Hosh relies on *INS v. St. Cyr*, 533 U.S. 289 (2001) for the proposition that courts should apply the rule of lenity before deferring to an agency determination under *Chevron*, but *St. Cyr* requires no such thing. The rule of lenity did "buttress[ ]" the Court's decision in *St. Cyr*, 533 U.S. at 320, and the Court indeed did not defer to an agency determination under *Chevron*. However, the Court expressly relied on a prior case, *Landgraf v. USI Film Products*, 511 U.S. 244, 264 (1994), in which the Court, in turn, invoked the presumption against retroactivity, a hallmark of statutory construction, to hold that a statute that is ambiguous with respect to its retroactive application must be construed as unambiguously prospective. *St. Cyr*, 533 U.S. at 320 n.45; *see Landgraf*, 511 U.S. at 265 ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.") (footnote omitted). The prospect of retroactivity does not arise in the instant matter. *St. Cyr*, therefore, turned primarily on considerations that are not before this Court, and it does not compel us to invoke the rule of lenity.