**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONY PREAP; EDUARDO VEGA
PADILLA; JUAN LOZANO
MAGDALENO,
  *Plaintiffs-Appellees*,

v.

JEH JOHNSON, Secretary,
Department of Homeland
Security; LORETTA E. LYNCH,
Attorney General; TIMOTHY S.
AITKEN; GREGORY
ARCHAMBEAULT; DAVID
MARIN,
  *Defendants-Appellants*.

Nos. 14-16326
        14-16779

D.C. No.
4:13-cv-05754-YGR

OPINION

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted July 8, 2015
Seattle, Washington

Filed August 4, 2016

Before: Andrew J. Kleinfeld, Jacqueline H. Nguyen,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY*

## Immigration

The panel affirmed the district court's class certification order and preliminary injunction in a class action habeas petition brought by criminal aliens subject to mandatory detention under 8 U.S.C. § 1226(c).

The panel held that under the plain language of 8 U.S.C. § 1226(c), the government may detain without a bond hearing only those criminal aliens it takes into immigration custody promptly upon their release from the triggering criminal custody.

The panel specified that it was holding that the mandatory detention provision of § 1226(c) applies only to those criminal aliens detained promptly after their release from criminal custody, not to those detained long after.

# COUNSEL

Hans Harris Chen (argued) and Troy D. Liggett, Trial Attorneys; Elizabeth J. Stevens, Assistant Director; William C. Peachey, Director, District Court Section; Civil Division, Office of Immigration Litigation, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Theresa H. Nguyen (argued) and Ashok Ramani, Keker & Van Nest LLP, San Francisco, California; Michael K.T. Tan, ACLU Immigrants' Rights Project, New York, New York; Julia Harumi Mass, ACLU Foundation of Northern California, San Francisco, California; Anoop Prasad, Asian Law Caucus, San Francisco, California; for Plaintiffs-Appellees.

**OPINION**

NGUYEN, Circuit Judge:

Every day in the United States, the government holds over 30,000 aliens in prison-like conditions while determining whether they should be removed from the country.[1] Some are held because they were found, in a bond hearing, to pose a risk of flight or dangerousness. 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d). Others, however, are held without bond because they have committed an offense enumerated in a provision of the Immigration and Naturalization Act ("INA"). 8 U.S.C. § 1226(c). Aliens in this latter group are subject to the INA's mandatory detention provision, which requires immigration authorities to detain them "when [they are] released" from criminal custody, 8 U.S.C. § 1226(c)(1), and to hold them without bond, 8 U.S.C. § 1226(c)(2). A broad range of crimes is covered under the mandatory detention provision, from serious felonies to misdemeanor offenses involving moral

---

[1] U.S. Immigration and Customs Enforcement, ERO Facts and Statistics 3 (2011), http://www.ice.gov/doclib/foia/reports/ero-facts-and-statistics.pdf.

turpitude and simple possession of a controlled substance. 8 U.S.C. §§ 1226(c)(1)(A)–(D).

This mandatory detention provision has been challenged on various grounds. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 513 (2003) (upholding the constitutionality of the provision against a due process challenge); *Rodriguez v. Robbins*, 804 F.3d 1060, 1078–81 (9th Cir. 2015) (*Rodriguez III*), *cert. granted sub nom.*, *Jennings v. Rodriguez*, No. 15-1204, 2016 WL 1182403 (June 20, 2016) (holding that detainees are entitled to a bond hearing after spending six months in custody).**[2]** Here, we are faced with another such challenge; this time, regarding the meaning of the phrase "when [they are] released" in § 1226(c)(1), and whether it limits the category of aliens subject to detention without bond under § 1226(c)(2). Specifically, we must decide whether an alien *must* be detained without bond even if he has resettled into the community after release from criminal custody. If the answer is no, then the alien *may* still be detained, but he may seek release in a bond hearing under § 1226(a) by showing that he poses neither a risk of flight nor a danger to the community.

Addressing this issue requires us to consider the interaction of the two paragraphs of the mandatory detention provision, 8 U.S.C. § 1226(c). Paragraph (1) requires the Attorney General ("AG") to "take into custody any alien who [commits an offense enumerated in subparagraphs (A)– (D)] when the alien is released [from criminal custody]." 8 U.S.C. § 1226(c)(1). Paragraph (2) prohibits the release of "an alien described in paragraph (1)" except in limited

---

**[2]** For a detailed history of decisions from the Supreme Court and this court dealing with the various immigration detention statutes, see *Rodriguez III*, 804 F.3d at 1067–70.

circumstances concerning witness protection.  8 U.S.C. § 1226(c)(2).  Plaintiffs argue that the phrase "when . . . released" in paragraph (1) applies to paragraph (2) as well, so that an alien must be held without bond only if taken into immigration custody promptly upon release from criminal custody for an enumerated offense. The government, by contrast, argues that "an alien described in paragraph (1)" is any alien who commits a crime listed in §§ 1226(c)(1)(A)–(D) regardless of how much time elapses between criminal custody and immigration custody.  According to the government, individuals not detained "when . . . released" from criminal custody as required by paragraph (1) are still considered "alien[s] described in paragraph (1)" for purposes of the bar to bonded release in paragraph (2).

To date, five of our sister circuits have considered this issue, and four have sided with the government. Significantly, however, there is no consensus in the reasoning of these courts.  The Second and Tenth Circuits found that the phrase "an alien described in paragraph (1)" was ambiguous, and thus deferred to the BIA's interpretation of the phrase to mean "an alien described in subparagraphs (A)–(D) of paragraph (1)."  *See Lora v. Shanahan*, 804 F.3d 601, 612 (2d Cir. 2015) ("Consistent with *Chevron*, we are not convinced that the interpretation is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Adams v. Holder*, 692 F.3d 91, 95 (2d Cir. 2012))); *Olmos v. Holder*, 780 F.3d 1313, 1322 (10th Cir. 2015) ("The text, the statutory clues, and canons of interpretation do not definitively clarify the meaning of § 1226(c).").  The Fourth Circuit has held that "when . . . released" means any time after release, but it did so under a misconception that the BIA

had so interpreted the phrase.**[3]**  *Hosh v. Lucero*, 680 F.3d 375, 380–81 (4th Cir. 2012).  Finally, the Second, Third, and Tenth Circuits applied the loss-of-authority rule, finding that the AG's duty to detain criminal aliens under § 1226(c)(1) continues even if the government fails to comply with the "when . . . released" condition.  *See, e.g.*, *Sylvain v. Atty Gen. of United States*, 714 F.3d 150, 157 (3d Cir. 2013) (holding that "[e]ven if the statute calls for detention 'when the alien is released,' and even if 'when' implies something less than four years, nothing in the statute suggests that immigration officials lose authority if they delay"); *see also Lora*, 804 F.3d at 612; *Olmos*, 780 F.3d at 1325–26.

On the other hand, the government's position has been rejected by most district courts to consider the question and, most recently, by three of six judges sitting en banc in the First Circuit.**[4]**  *See Castañeda v. Souza*, 810 F.3d 15, 18–43 (1st Cir. 2015) (en banc) (Barron, J.).  In an opinion written by Judge Barron, these three judges concluded that the statutory context and legislative history make clear that aliens can be held without bond under § 1226(c)(2) only if taken into immigration custody pursuant to § 1226(c)(1)

---

**[3]** As other circuits have recognized, the BIA has never formally interpreted the phrase "when the alien is released."  *See, e.g.*, *Sylvain v. Atty Gen. of United States*, 714 F.3d 150, 157 n.9 (3d Cir. 2013) ("The specific term interpreted in *Rojas* is the phrase 'an alien described in paragraph (1).'").  In fact, far from interpreting the phrase in the manner suggested by the Fourth Circuit, the BIA has said in passing that "when . . . released" does require immediacy.  *In re Rojas*, 23 I. & N. Dec. 177, 122 (BIA 2001) ("The statute does direct the [AG] to take custody of aliens immediately upon their release from criminal confinement.").

**[4]** Because the First Circuit split evenly on the question, its opinions are not binding on lower courts.  The district court's judgments were affirmed.  *Castañeda*, 810 F.3d at 19.

"when . . . released" from criminal custody, not if there is a lengthy gap after their release.  *See id.* at 36, 38.

We agree with Judge Barron and his two colleagues.  The statute unambiguously imposes mandatory detention without bond only on those aliens taken by the AG into immigration custody "when [they are] released" from criminal custody.  And because Congress's use of the word "when" conveys immediacy, we conclude that the immigration detention must occur promptly upon the aliens' release from criminal custody.

## I.

The named Plaintiffs in this case are lawful permanent residents who have committed a crime that could lead to removal from the United States.  Plaintiffs served their criminal sentences and, upon release, returned to their families and communities.  Years later, immigration authorities took them into custody and detained them without bond hearings under § 1226(c).  Plaintiffs argue that because they were not detained "when . . . released" from criminal custody, they were not subject to mandatory detention under § 1226(c). [5]

Mony Preap, born in a refugee camp after his family fled Cambodia's Khmer Rouge, has been a lawful permanent resident of the United States since 1981, when he immigrated here as an infant.  He has two 2006 misdemeanor convictions for possession of marijuana.  Years after being

_____

[5] Plaintiffs raised both a statutory challenge and a Due Process challenge before the district court.  The district court resolved the case on statutory grounds, and thus did not reach the Due Process question. *Preap v. Johnson*, 303 F.R.D. 566, 574 n.5 (N.D. Cal. 2014).  Neither do we.

released at the end of his sentences for these convictions, Preap was transferred to immigration detention upon serving a short sentence for simple battery (an offense not covered by the mandatory detention statute) and held without a bond hearing. Since the instant litigation began, Preap has been granted cancellation of removal and released from immigration custody.[6]

Eduardo Vega Padilla has been a lawful permanent resident since 1966, shortly after he came to the United States as an infant. Padilla also has two drug possession convictions—one from 1997 and one from 1999—and a 2002 conviction for owning a firearm with a prior felony conviction. Eleven years after finishing his sentence on that last conviction, he was placed in removal proceedings and held in mandatory detention. Padilla eventually obtained release after receiving a bond hearing under our decision in *Rodriguez v. Robbins* (*Rodriguez II*), 715 F.3d 1127, 1144 (9th Cir. 2013), in which we held that the government's detention authority shifts from § 1226(c) to § 1226(a) after a detainee has spent six months in custody; *Rodriguez v.*

---

[6] The district court rejected the government's argument that Preap's cancellation of removal mooted his claim, and the government has not challenged that determination. We agree that the claims of the named Plaintiffs on behalf of the class are not mooted by Plaintiffs' release from detention or termination of removal proceedings because the claims are "transitory in nature and may otherwise evade review." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090-91 (9th Cir. 2011); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980) (explaining when a "claim on the merits is 'capable of repetition, yet evading review,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation" (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975))); *Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014) (holding that Article III justiciability requirements were satisfied despite the expiration of the named plaintiff's claim for injunctive relief).

*Robbins*, 804 F.3d 1060, 1078–81 (9th Cir. 2015) (*Rodriguez III*), *cert. granted sub nom.*, *Jennings v. Rodriguez*, No. 15-1204, 2016 WL 1182403 (June 20, 2016).

Juan Lozano Magdaleno has been a lawful permanent resident since he immigrated to the United States as a teenager in 1974. Magdaleno has a 2000 conviction for owning a firearm with a prior felony conviction, and a 2007 conviction for simple possession of a controlled substance. He was sentenced to six months on the possession charge and released from jail in January 2008. Over five years later, Magdaleno was taken into immigration custody and held without bond pursuant to § 1226(c). He also was later released from detention following a *Rodriguez* hearing.

These three Plaintiffs filed a class action petition for habeas relief in the Northern District of California. The district court granted their motion for class certification, certifying a class of all "[i]ndividuals in the state of California who are or will be subjected to mandatory detention under 8 U.S.C. section 1226(c) and who were not or will not have been taken into custody by the government immediately upon their release from criminal custody for a Section 1226(c)(1) offense." The district court also issued a preliminary injunction requiring the government to provide all class members with bond hearings under § 1226(a).[7] *Preap v. Johnson*, 303 F.R.D. 566, 571, 584 (N.D. Cal. 2014). This appeal followed.

---

[7] The district court held that if the named Plaintiffs prevailed in their interpretation of § 1226(c), then they would have met their burden under all four prongs of the preliminary injunction test set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). The government has waived any challenge to that determination by declining to dispute it on appeal.

## II.

We have jurisdiction to review this class action habeas petition under 28 U.S.C. § 1291. The jurisdiction-stripping provision of 8 U.S.C. § 1226(e), which bars judicial review of discretionary agency decisions regarding immigrant detention, does not bar us from hearing "challenges [to] the statutory framework that permits [petitioners'] detention without bail." *Demore v. Kim*, 538 U.S. 510, 517 (2003). We review questions of statutory construction de novo. *United States v. Bert*, 292 F.3d 649, 651 (9th Cir. 2002).

## III.

The government's authority to detain immigrants in removal proceedings arises from two primary statutory sources.[8] The first, 8 U.S.C. § 1226(a), grants the AG discretion to arrest and detain any alien upon the initiation of removal proceedings.[9] Under this provision, the AG may then choose to keep the alien in detention, or allow release on conditional parole or bond. 8 U.S.C. § 1226(a)(1)–(2).[10]

---

[8] Other provisions of the Immigration and Nationality Act (INA) govern the detention of individuals considered "applicants for admission," *see* 8 U.S.C. § 1225(b), or those awaiting deportation after entry of a final order of removal, *see* 8 U.S.C. § 1231(a), among other categories. These detention provisions are not implicated here.

[9] The Homeland Security Act of 2002, Pub. L. No. 107-296 § 471, 116 Stat. 2135 (2002), moved many immigration enforcement responsibilities from the Department of Justice to the Department of Homeland Security. *See Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003). Because the statute at issue refers to the Attorney General, we will continue to do so here.

[10] The discretionary detention provision reads as follows:

If the AG opts for detention, the alien may seek review of that decision at a hearing before an immigration judge ("IJ"), 8 C.F.R. § 236.1(d)(1), who may overrule the AG and grant release on bond, *id.* § 1003.19. The alien bears the burden of proving his suitability for release, and the IJ should consider whether he "is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006); *see also* 8 § C.F.R. 1236.1(c)(8).

The second provision is 8 U.S.C. § 1226(c), the mandatory detention provision at issue in this case. Importantly, this provision operates as a limited exception to § 1226(a). *See* 8 U.S.C. § 1226(a). ("Except as provided in subsection (c) of this section . . ."). Section 1226(c) reads as follows:

---

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General–

**(1)** may continue to detain the arrested alien; and

**(2)** may release the alien on–

    **(A)** bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

    **(B)** conditional parole[.]

8 U.S.C. § 1226(a).

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who –

    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or

    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title

**when the alien is released**, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

> The Attorney General may release **an alien described in paragraph (1)** only if the Attorney General decides pursuant to [the Federal Witness Protection Program] that release of the alien from custody is necessary . . . [and] the alien will not pose a danger to . . . safety . . . and is likely to appear for any scheduled proceeding.

8 U.S.C. § 1226(c) (emphases added) (footnote omitted). We must decide the proper scope of this mandatory detention exception, and specifically whether it applies to aliens who are not promptly placed in removal proceedings upon their release from criminal custody for an offense listed in § 1226(c)(1)(A)–(D).

The government advances three arguments to support its view that Plaintiffs are subject to mandatory detention under § 1226(c). First, it argues that we should give *Chevron* deference, as have the Second and Tenth Circuits, to the BIA's interpretation that the phrase "an alien described in Paragraph (1)" means "an alien described in subparagraphs (A)–(D) of paragraph (1)," thus subjecting all criminal aliens who have committed one of the listed crimes to mandatory detention regardless of when they were taken into immigration custody. *See In re Rojas*, 23 I. & N. Dec. 117, 121 (BIA 2001). Second, the government argues that we should follow the Fourth Circuit in holding that "when . . . released" is a duty-triggering clause, not a time-limiting clause, and that, as such, it merely informs the AG when the duty to detain arises, not when the duty must be performed.

*Hosh v. Lucero*, 680 F.3d 375, 381 (4th Cir. 2012).**[11]** Third, the government argues that we should follow the Second, Third, and Tenth Circuits in holding that, even if Congress intended that immigration authorities promptly detain criminal aliens when they are released from criminal custody, Congress did not clearly intend that they would lose the authority to do so in the event of delay.

We find all three arguments unpersuasive. We agree with Judge Barron and his colleagues on the First Circuit in *Castañeda*, 810 F.3d at 19, that the government's positions contradict the intent of Congress expressed through the language and structure of the statute.

## A.

We first address the government's argument that we should defer to the BIA's interpretation of § 1226(c)(2)'s phrase "an alien described in paragraph (1)" to mean "an alien described in subparagraphs (A)–(D) of paragraph (1)." *See Rojas*, 23 I. & N. Dec. at 125 ("We construe the phrasing 'an alien described in paragraph (1),' as including only those aliens described in subparagraphs (A) through (D) of section [(c)(1)], and as not including the 'when released' clause."). Under this interpretation, § 1226(c)(2)'s detention-without-bond requirement applies to any alien who has committed an offense enumerated in § 1226(c)(1), regardless of how long after release from criminal custody he or she was taken into immigration custody. This interpretation is at odds with the statute, which unambiguously links the "when . . . released"

---

**[11]** The Fourth Circuit incorrectly attributed this interpretation to the BIA. *See Hosh*, 680 F.3d at 380 (reasoning that the phrase "when . . . released" is ambiguous and deferring to the BIA's "permissible construction").

custody instruction in § 1226(c)(1) to the without-bond instruction in § 1226(c)(2), such that the latter applies only after the former is satisfied.

When faced with a question of statutory interpretation, our analysis begins "with the text of the statute." *Yokeno v. Sekiguchi*, 754 F.3d 649, 653 (9th Cir. 2014). The words of a statute should be accorded their plain meaning, as considered in light of "the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). We cannot look to the statute's language in isolation because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

Starting with the text, we find that § 1226(c)(2) is straightforward. It refers simply to "an alien described in paragraph (1)," not to "an alien described in subparagraphs (1)(A)–(D)." We must presume that Congress selected its language deliberately, thus intending that "an alien described in paragraph (1)" is just that—*i.e.* an alien who committed a covered offense *and* who was taken into immigration custody "when . . . released." *See Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructurers Grp.*, 387 F.3d 1046, 1051 (9th Cir. 2004) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))). Certainly, had Congress wanted to refer

only to "an alien described in subparagraphs (A)–(D)," it could have done so. And while we recognize that "Congress has not always been consistent in how it refers to other subsections in the same statute," *Olmos*, 780 F.3d at 1320 (describing a separate provision where Congress referred to "subparagraph (a)" but the context made it obvious that Congress was referring to only subparts (i) and (ii)), we observe that, unlike the example cited by the Third Circuit in *Olmos*, this section's context supports, rather than contradicts, the plain meaning.**[12]**

As mentioned, there are two relevant sources of authority for the government's detention of aliens in removal proceedings—§ 1226(a) and § 1226(c). Section 1226(a) provides for discretionary detention of any alien in removal proceedings, while § 1226(c) provides a limited exception of mandatory detention for a specified group of aliens. Thus, if the government is not authorized to detain an alien under the narrow exception of § 1226(c), it may only do so under the general rule of § 1226(a). Critically, however, each of these sections includes its own corresponding instructions for releasing detained aliens—§ 1226(a) provides for possible release on bond, while § 1226(c) forbids any release except under special circumstances concerning witness protection. There is one important consequence of this structure: under both the general detention provision in § 1226(a) and the mandatory detention provision in § 1226(c), the authority to detain and the authority to release go hand in hand. That is, an alien detained under § 1226(a)

---

**[12]** We are thus unpersuaded by the government's argument that there is ambiguity in whether the phrase "when the alien is released" modifies the noun "alien" or only the verb "take into custody." Even if we agreed that the phrase were ambiguous standing alone, it is not ambiguous within the section's structure and surrounding language.

is clearly subject to the release provisions of § 1226(a), whereas one detained under § 1226(c) is subject to the release provisions in § 1226(c). Accordingly, if an alien is not detained in immigration custody "when . . . released" from criminal custody, as required under § 1226(c)(2), then the government derives its sole authority to detain that alien from § 1226(a)(1), and, as a consequence, it must provide the alien with a bond hearing as required under § 1226(a)(2).

The BIA's interpretation in *In re Rojas* flouts this structure. The BIA held that the "when . . . released" clause was "address[ed] . . . to the statutory command that the 'Attorney General shall take into custody' certain categories of aliens," but that it did not define the categories of aliens subject to the prohibition on bonded release in § 1226(c)(2). *In re Rojas*, 23 I. & N. Dec. at 121. The BIA thereby held, in essence, that the AG can fail to comply with the "when . . . released" requirement of § 1226(c)(1)—thereby necessarily relying on § 1226(a) for its authority to take custody of an alien—but still apply the release conditions of § 1226(c)(2). In other words, even if § 1226(c)(1) authorizes the custody of only those aliens who are detained "when [they are] released" from criminal custody, not those who are detained at a later time, the BIA would still apply § 1226(c)(2)'s proscription on bonded release from immigration custody. This reading simply fails to do justice to the statute's structure. *See Castañeda*, 810 F.3d at 26 (noting that under the BIA's reading, the statute is "oddly misaligned" because it necessarily "de-link[s] the 'Custody' directive in § 1226(c)(1) from the bar to 'Release' in (c)(2)").

The headings in § 1226(c) further illustrate this point. Section 1226(c) as a whole is entitled "Detention of criminal aliens." This heading conveys to the reader that the section provides an exception to the general detention rule of

§ 1226(a), and that this exception concerns the detention of certain criminal aliens.  The two paragraphs within the section are entitled "Custody" and "Release."  These headings inform the reader that the section governs the full life cycle of the criminal aliens' detention, with the first paragraph specifying the requirements for taking them into custody, and the second specifying the restrictions on their release.  This structure suggests only one logical conclusion: the release provisions of § 1226(c)(2) come into effect only after the government takes a criminal alien into custody according to § 1226(c)(1).  And, correspondingly, if the government fails to take an alien into custody according to § 1226(c)(1), then it necessarily may do so only under the general detention provision of § 1226(a), and we never reach the release restrictions in § 1226(c)(2).

*Rojas*'s contrary reading, as Judge Barron explained, would mean that Congress directed the AG to hold without bond aliens "who had never been in criminal custody"— because with the "when . . . released" clause rendered inoperative for purposes of § 1226(c)(2), there would be nothing to impose a requirement of the aliens ever having been in custody.[13]  *Castañeda*, 810 F.3d at 27.  At the same time, *Rojas*'s reading would leave the AG "complete

---

[13] This effect occurs because, as Judge Barron noted in *Castañeda*, "there are a variety of offenses for which an alien may be . . . subject to mandatory detention under [§ 1226(c)(1)(A)], but that may never give rise to a formal charge, let alone an indictment, trial or conviction." 810 F.3d at 26 (alterations in original) (quoting *Saysana v. Gillen*, 590 F.3d 7, 14 (1st Cir. 2009)).  "In consequence, some aliens who fall within subparagraphs (A)–(D) will not be subject to (c)(1) because they will never have even been 'released' from criminal custody as the 'when . . . released' clause requires." *Id.* at 27.  Such aliens can only be taken into immigration custody under the discretionary detention provision in § 1226(a).

discretion to decide not to take [such aliens] into immigration custody at all." *Id.* These incongruous consequences further persuade us to reject the BIA's reading.

Notably, neither the BIA nor those circuits that deferred to the BIA adequately addressed the structure of the relationship between § 1226(a) and § 1226(c). Indeed, the BIA and the Second Circuit failed to address it at all. *See Lora v. Shanahan*, 804 F.3d 601, 611 (2d Cir. 2015) (deeming it ambiguous whether the "when . . . released" clause "is part of the definition of aliens subject to mandatory detention" without considering statutory context); *In re Rojas*, 23 I. & N. Dec. at 121–22 (considering statutory context but failing to acknowledge the relationship between § 1226(a) and § 1226(c)). The Tenth Circuit did address it, and even seemed to agree with our conclusion that custody must be authorized under paragraph (1) of § 1226(c) in order for paragraph (2) to take effect. *Olmos*, 780 F.3d at 1321 (recognizing that the authority to detain "arises in Paragraph '1'" and that "the [AG] must exercise this responsibility 'when the alien is released'"). But, applying the loss-of-authority doctrine, that court concluded that the government maintains its authority to take custody of an alien under § 1226(c)(1) even when it fails to comply with the "when . . . released" requirement. *Olmos*, 780 F.3d at 1321–22 ("With the alien in the [AG's] custody under his delayed enforcement of § 1226(c)(1), there would be nothing odd about § 1226(c)(2)'s restrictions on when the alien can be released."). Finding that the "when . . . released" requirement imposed no actual limitations on the government, the Tenth Circuit thus concluded that the BIA's interpretation—reading out the "when . . . released" requirement—was reasonable. *Id.* We disagree. As we later explain, the loss-of-authority doctrine does not apply to

§ 1226(c). And absent this doctrine, we are left with the conclusion that the AG must comply with § 1226(c)(1), including the "when . . . released" requirement, before it can apply § 1226(c)(2).

In sum, we conclude that paragraph (2)'s limitations on release unambiguously depend upon paragraph (1)'s mandate to take custody. "An alien described in paragraph (1)" is therefore one who is detained according to the requirements of paragraph (1). These requirements include the mandate that the government take the alien into custody "when . . . released." The BIA's interpretation to the contrary is impermissible.[14]

### B.

We must next decide whether the AG is in compliance with § 1226(c)(1)'s custody mandate—and thus § 1226(c)(2)'s limitations on release apply—even if the AG takes an alien into custody after substantial time has passed since the alien's release from criminal custody. Plaintiffs argue that § 1226(c)(1)'s mandate requiring the AG to detain criminal aliens "when [they are] released" from criminal custody means that they must be taken into custody *promptly* after release, not years later, as were the named Plaintiffs here. The government, on the other hand, argues that the phrase "when . . . released" is ambiguous, supporting either Plaintiffs' reading or a broader reading requiring mandatory detention of any criminal alien arrested by the AG at any point after release from criminal custody. The government's

---

[14] "Because the statutory language is unambiguous, we end our inquiry at *Chevron*'s first step, and need not reach the question [of] whether the BIA's approach is based on a permissible construction of the statute." *Aragon-Salazar v. Holder*, 769 F.3d 699, 706 (9th Cir. 2014).

argument wrongly assumes that the BIA had so construed "when . . . released." On the contrary, the BIA explicitly stated that "[t]he statute does direct the [AG] to take custody of aliens *immediately* upon their release from criminal confinement." *Rojas*, 23 I. & N. Dec. at 122 (emphasis added). And even if the BIA had construed the phrase not to require immediate confinement, the statute would foreclose that construction because "when . . . released" unambiguously requires promptness.

Again, we start with the plain language: "The Attorney General shall take into custody any alien who [commits an enumerated offense] when the alien is released [from criminal custody]." 8 U.S.C. § 1226(c). As Judge Barron observed, the first thing that leaps out is that "Congress chose a word, 'when,' that naturally conveys some degree of immediacy as opposed to a purely conditional word, such as 'if.'" *Castañeda*, 810 F.3d at 37 (citation omitted). Of course, the word "when" has multiple dictionary definitions.[15] But looking to context, which of these meanings is the intended one is clear. The word "when" used in a command such as this one requires prompt action. Consider a teacher's common instruction to stop writing *when* the exam ends. There is no doubt that such an instruction requires the student to immediately stop writing

---

[15] *See, e.g.* Black's Law Dictionary 1842 (3d ed. 1933) (defining "when" alternatively as "[i]mmediately after; as soon as" and as "[i]n case of; on condition that; provided; if"); *see also Hosh*, 680 F.3d at 379–80 (reasoning that the term "when" "can be read, on one hand, to refer to 'action or activity occurring at the time that or as soon as other action has ceased or begun'" or "[o]n the other hand, . . . to mean the temporally broader 'at or during [which] time'" (first quoting *Waffi v. Louiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007), then quoting *Free Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/when)).

at the end of the exam period.  Or as one district court noted, "if a wife tells her husband to pick up the kids *when* they finish school, implicit in this command . . . is the expectation that the husband is waiting at the moment" school ends. *Sanchez-Penunuri v. Longshore*, 7 F. Supp. 3d 1136, 1155 (D. Colo. 2013); *see also Khoury v. Asher*, 3 F. Supp. 3d 877, 887 (W.D. Wash. 2014) ("A mandate is meaningless if those subject to it can carry it out whenever they please."). Similarly, the use of the phrase "when . . . released," when paired with the directive to detain, unambiguously requires detention with "some degree of immediacy." *Hosh v. Lucero*, 680 F.3d 375, 381 (4th Cir. 2012).

Indeed, "[i]f Congress really meant for the duty in (c)(1) to take effect 'in the event of' or 'any time after' an alien's release from criminal custody, we would expect Congress to have said so, given that it spoke with just such directness elsewhere in the IIRIRA." *Castañeda*, 810 F.3d at 38 (citing 8 U.S.C. § 1231(a)(5) ("[T]he alien shall be removed under the prior order *at any time after* the reentry." (emphasis added)); *see also Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1230 (W.D. Wash. 2004) (noting that Congress "easily could have used the language '*after* the alien is released,' 'regardless of when the alien is released,' or other words to that effect").  But instead Congress chose words that signal an expectation of immediate action. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context [as] a phrase 'gathers meaning from the words around it.'" (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961))).  This word choice must be given its due weight.

Moreover, unlike the government's interpretation, our reading is consistent with Congress's purposes in enacting the mandatory detention provision—to address heightened

risks of flight and dangerousness associated with aliens who commit certain crimes, which are serious enough to give rise to criminal custody. *See Demore*, 538 U.S. at 518–19 (describing evidence before Congress). These purposes are ill-served when the critical link between criminal detention and immigration detention is broken and the alien is set free for long stretches of time. Congress's concerns over flight and dangerousness are most pronounced at the point when the criminal alien is released. Consequently, we can be certain that Congress did not intend to authorize delays in the detention of these criminal aliens. And correspondingly, without considering the aliens' conduct in any intervening period of freedom, it is impossible to conclude that the risks that once justified mandatory detention are still present. These considerations are prudently reflected in Congress's decision that these individuals must be detained "when . . . released," and that if they aren't, the AG may detain them only if warranted under the general detention provision of 8 U.S.C. § 1226(a), upon a bond hearing during which an individualized assessment of risks is conducted. We therefore conclude that the phrase "when . . . released" connotes some degree of immediacy.

## C.

Finally, we turn to the government's argument that even if § 1226(c)(1) unambiguously requires prompt detention, we should nonetheless uphold the AG's authority to detain without bond an alien who committed a covered offense even when the AG has violated the mandate of § 1226(c)(1). The government points to a line of cases holding that: "[i]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 159 (2003)

(quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993)); *see also id.* at 158 ("Nor, since *Brock* [*v. Pierce County*, 476 U.S. 253 (1986)], have we ever construed a provision that the government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later."); *United States v. Nashville, C & St. L. Ry.*, 118 U.S. 120, 125 (1886); *United States v. Dolan*, 571 F.3d 1022, 1027 (10th Cir. 2009).  Under this "loss-of-authority" line of cases, the government's argument goes, the AG's failure to timely take into custody a criminal alien in no way affects her ability to act pursuant to the mandatory detention provision of § 1226(c)(2).  Several circuits have agreed.  *See Sylvain*, 714 F.3d at 157; *Lora*, 804 F.3d at 612–13; *Olmos*, 780 F.3d at 1324–26.

The courts adopting this reasoning rely on *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990), in which the Supreme Court interpreted a provision of the Bail Reform Act that required judicial officers to hold a bond hearing "immediately upon the [defendant]'s first appearance before the judicial officer."  18 U.S.C. § 3142(f)(2).  Montalvo-Murillo didn't receive a timely hearing under this provision, and the district court released him from custody.  The Supreme Court reversed, holding that "a failure to comply with the first appearance requirement does not defeat the government's authority to seek detention of the person charged."  495 U.S. at 717.  The Court noted that nowhere did the statute provide for the release of pretrial detainees as a remedy for the failure by judicial officers to provide prompt hearings.  *Id.*  And it concluded that "[a]utomatic release contravene[d] the object of the statute, to provide fair bail procedures while protecting the safety of the public and assuring the appearance . . . of defendants . . . ."  *Id.* at 719.  To hold otherwise, the Court reasoned, would "bestow upon the defendant a windfall" and impose on the public "a severe

penalty" by "mandating release of possibly dangerous defendants every time some deviation" from the statute occurred. *Id.* at 720. Looking to this decision, our sister circuits have treated *Montalvo-Murillo* as a "close[] analog" to the dispute over § 1226(c)'s limitations. *Sylvain*, 714 F.3d at 158. We find, however, that *Montalvo-Murillo* is readily distinguishable.

Critically, unlike in *Montalvo-Murillo*, the government here invokes the loss-of-authority doctrine to justify extending a statutory provision that in fact curtails, rather than expands, the government's discretionary authority. *See* Farrin R. Anello, *Due Process and Temporal Limits on Mandatory Immigration Detention*, 65 Hastings L. J. 363, 367 (2014) ("The [mandatory detention provision] strips the immigration judge of her power to conduct a bond hearing and decide whether the individual poses any danger or flight risk, and likewise precludes DHS from making discretionary judgments about whether detention is appropriate.").[16] Indeed, the sole practical effect of the district court's decision in this case is to *reinstate* the government's general authority, under § 1226(a), to decline to detain, or to release on bond, those criminal aliens who are not timely detained under § 1226(c). In short, we decline to apply the loss-of-authority doctrine where, as here, there is no loss of authority.

---

[16] Congress's purposes in enacting the provision further demonstrate its desire to curtail the authority of the immigration judge and DHS to release recently incarcerated criminals from immigration custody. *See Demore v. Kim*, 538 U.S. 510, 518-19 (2003) (noting Congress's concerns that immigration authorities had a "near-total inability to remove deportable criminal aliens" and often made detention decisions on the basis of "funding and detention space").

Moreover, unlike the district court's ruling in *Montalvo-Murillo*, our holding does not craft a new remedy inconsistent with the statutory scheme. Whereas in *Montalvo-Murillo* the statute at issue did not identify a remedy for a delayed hearing, *see United States v. Montalvo-Murillo*, 876 F.2d 826, 831 (10th Cir. 1989) (per curiam) (noting that "Congress did not provide . . . the remedy" for a violation of § 3142(f)), *overruled by Montalvo-Murillo*, 495 U.S. at 722), here the statutory structure makes clear precisely what occurs in the absence of prompt detention under 8 U.S.C. § 1226(c): the general detention provision, 8 U.S.C. § 1226(a), applies. Far from imposing a judicially-created remedy for untimely detention, we are merely holding that under the statute, the conditions for the mandatory detention exception are not met when detention is too long delayed. *See Castañeda*, 810 F.3d at 40–41 (distinguishing several cases where courts improperly fashioned their own sanctions).

We do not share the Third Circuit's concern that failing to apply the loss-of-authority doctrine "would lead to an outcome contrary to the statute's design: a dangerous alien would be eligible for a hearing—which could lead to his release—merely because an official missed the deadline." *Sylvain*, 714 F.3d at 160. Congress's design of protecting the public by detaining criminal aliens is undoubtedly premised on the notion that *recently* released criminal aliens may be presumed a risk. Such a presumption carries considerably less force when these aliens live free and productive lives after serving their criminal sentences. *See Saysana v. Gillen*, 590 F.3d 7, 17–18 (1st Cir. 2009) ("By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be."). Indeed, the imposition of robotic detention procedures in

such cases not only smacks of injustice, but also drains scarce detention resources that should be reserved for those aliens who pose the greatest risks.

We therefore hold that the mandatory detention provision of 8 U.S.C. § 1226(c) applies only to those criminal aliens who are detained promptly after their release from criminal custody, not to those detained long after.

## IV.

In so holding, we are not suggesting that the mandate to detain "when . . . released" necessarily requires detention to occur at the exact moment an alien leaves criminal custody. The plain meaning of "when . . . released" in this context suggests that apprehension must occur with a reasonable degree of immediacy. *Accord Hosh*, 680 F.3d at 381 ("[W]e agree that Congress's command . . . connotes some degree of immediacy . . . ."); *Rojas*, 23 I. & N. Dec. at 122 ("The statute does direct the [AG] to take custody of aliens immediately upon their release from criminal confinement."). Thus, depending on the circumstances of an individual case, an alien may be detained "when . . . released" even if immigration authorities take a very short period of time to bring the alien into custody.

This appeal, however, does not present the question exactly how quickly detention must occur to satisfy the "when . . . released" requirement. The class was defined as those who were not "immediately detained" but were still taken into mandatory custody, and the government did not challenge the class definition on the ground that it required further clarification as to the meaning of "immediately." Nor did the government appeal class certification on the ground that the named class members were not typical of the class as a whole—even though the named Plaintiffs spent

years in their home communities after completing their criminal sentences, whereas some class members presumably were released for shorter times. We thus need not decide for purposes of the instant appeal exactly how promptly an alien must be brought into immigration custody after being released from criminal custody for the transition to be immediate enough to satisfy the "when . . . released" requirement. The district court granted preliminary injunctive relief to a class of aliens who were not "immediately detained" when released from criminal custody, and that grant of relief accords with our interpretation of the statutory requirements.

\* \* \*

Under the plain language of 8 U.S.C. § 1226(c), the government may detain without a bond hearing only those criminal aliens it takes into immigration custody promptly upon their release from triggering criminal custody.

**AFFIRMED.**